23-1363. Counselor Tooth? Yes, your honor. You have reserved three minutes of your time for rebuttal, is that correct? Yes, your honor. And Mr. Marzullo you will argue for seven minutes and Mr. Gershongan, you will argue for 6-2. There is a cross-appeal, your honor, so I reserve two minutes for rebuttal on the cross-appeal. Okay. And you have the next seven minutes, your honor. All right. Mr. Toth? May it please the court, Brian Toth from the Department of Justice, representing Defendant Pellant, the United States. The trial court erred in holding the government liable for a Fifth Amendment taking of a plaintiff's property when their homes flooded for the first and only time in the 70-year history of the Coors Flood Control Project, which had operated during Hurricane Harvey, a natural disaster that was described by the Court of Federal Claims as the worst storm in the recorded history of the United States. That singular event, resulting in the flooding of plaintiff's properties, is best understood as a trespass, not a taking of plaintiff's properties, for which it would be compensable if at all only in tort. Can you try to help me understand how much of your argument depends on the extremity of the extremeness of this weather event, and how much would apply to less extreme, you know, once in every ten year kind of storm? So I think the extremity is related to the frequency, which you mentioned both, the once in ten year as a frequency. We think with a storm of this severity, that it was so infrequent that plaintiff's failure to introduce any proof at the liability stage of when such a storm might recur with the flooding resulting on plaintiff's property, again to the same magnitude, was fatal to their claim. So it's an important factor. I think it cuts across the liability question, whether you're inclined to do it. I guess I'm interested, I mean, suppose there were, you know, by definition we're talking about a storm that would go beyond the government purchased land behind the dams that would reach the plaintiffs. So let's assume that this is a kind of once every ten year event. What arguments do you still have in that hypothetical situation? In that hypothetical, we would still have the other, we think the Arkansas game and fish case would apply. I mean, they could, if they were able to demonstrate that the flooding was inevitably recurring, such that it regularly recurred once every ten years, just as in Idaho, which, you know, the government lost, but the rule became that inevitably recurring flooding, if demonstrated to a certain frequency, is a categorical taking, notwithstanding that it's temporary and recurring. So we think that frequency is an essential component of their being able to demonstrate it. So, I mean, why as a, you know, perhaps too simple minded way of putting it, this one will inevitably recur. It's just much, much less frequent. And the value of the easement would be presumably, you know, accordingly less. Why is that not the right way to think about it? Well, I, it is, it is one way to, you could think about it. I think there's a lot that goes into the, a lot of resources that go into a trial, not just on liability, but on compensation. And these valuations are very difficult, because these easements are so peculiar. And I think your question, Judge Toronto, highlights a factor that I'd like to mention. The Court of Federal Claims ordered the government to record an easement that it described as essentially an easement that the government would use only in the event of a natural disaster. I mean, there's no other recorded easement that... Did the government concede that without the dams, at least 10 of the 13 properties would not have flooded? Would not have flooded, without the dams? Yes. We're not, I'm not sure, but I know that we did, we're not arguing causation on appeal here. And we agree that some of the properties would have flooded without, I'm not sure, without the dams. No, we're not contending that the plaintiff's properties would have flooded without the dams. I mean, there are a lot of, these are just... No, I think it's the reverse, that had the dams not been built, the water presumably would have flowed to downtown Houston, and it wouldn't have built up to at least some of these plaintiffs' property. That's true. That's true. So the downstream, the causation matters more to the downstream plaintiffs. We're not arguing causation as to the upstream plaintiffs. So wouldn't you agree that the court created the conditions that caused the damage, the constructing, the operating, the using the project, the opening the gates, all of those combined, the court created the conditions? Well, the court was, we're not arguing causation. So we're not arguing that the court was not responsible for some increment of additional flooding that would occur. And then how's your argument about the singularity of the event data? So that's a factor that the Supreme Court has emphasized in both its categorical cases, the most recent one, Cedar Point, and its multi-factor cases, Arkansas, Game and Fish. And it said that in either situation, no matter how you're looking at the property injury, courts have long distinguished between one-time trespass and multiple invasions that eventually ripen into a taking. And in Cedar Point, the court described it, it said, isolated physical invasions not undertaken pursuant to a granted right of access are properly assessed as individual torts rather than appropriations of a property right. And it went on to emphasize that it had applied that same distinction, which it said was firmly grounded in its precedent, citing back to another. Right, but it sort of makes a difference what, at least one way to put it, is what isolated means. If it means unplanned, then that's one thing and probably excludes this case. This is a planned level of the dam that would create backup of water under some circumstances, more or less recognized the possibility where the water would back up sufficiently to cover some of these plaintiffs' land. And if isolated means unplanned in that sense, then that would not be a trespass. If it means just not really very frequent, that's another thing. So I would point the court to the Ridgeline decision, which quotes an older court of claims decision called Ehrbeid, when it says isolated invasions such as one or two floodings do not make a taking. So I think this court's predecessor in Ehrbeid and this court in Ridgeline discussed the isolated inquiry in terms of frequency of floodings. And I think that is a separate factor in the Arkansas game analysis distinct from foreseeability, which is how the court analyzed whether this was sufficiently planned to be knowable. And I'm happy to address foreseeability. But didn't the government also do kind of a cost benefit analysis here and was willing to effectively take the risk of possible flooding? What the court did, so this gets to the foreseeability point. And what I want to say here is that the court acquired enough land based on the worst storm of record in the basin at the time, that was the 1935 storm, to operate the project for 70 years without ever flooding plaintiff's property. And yet to the answer to your question is yes, the court did undertake a benefit analysis about whether to acquire additional land to the point where it would be necessary to operate the project to avoid a catastrophe of the dam utterly failing. Now that didn't occur here, but that's a result of the sound engineering and planning that the Army Corps of Engineers did. The fact that there's a remote but catastrophic possibility. You were aware that this remote incident was actually going to happen. It's not remote in that it's improbable. It's remote in maybe temporarily in terms of time. It was going to happen. And then going back to the point to where it seems that the court was bought enough property and that flooding was going to happen. So the meteorological data improved over the decades that the Corps was operating the project, but the Corps was not taking further action or constructing additions on the project. It would have to go to Congress to get authorization whether to acquire additional land or to modify the project in some way that would accommodate both the upstream and the downstream properties. And it just couldn't operate without, couldn't make those modifications without additional congressional authorization. So it's not going to be liable for inaction. Could you address damages? So I think the damages underscore the court's error in liability. The damages are, that we're disputing in our appeal, relate to compensation for an assortment of consequential losses. A variety of items such as personal property that happened to be in the different homes at the time of the flooding, lost profits from rent when individuals couldn't rent their, the units that flooded, or discount on rent for an individual who remained in a second floor when the first floor was flooded. So it's just an assortment of compensation that really looks a lot more like tort compensation. And so I think the errors that we identify in the compensation award really underscore the fact that the court itself was more comfortable treating the losses as tort-like losses where those types of incidentals and consequential values are more readily compensable. So getting back to that distinction between torts and takings and how the frequency plays into this, I think the frequency factor alone I think is determinative here. Certainly foreseeability can play a role in an Arkansas game and fish analysis, but when you look at all the different factors, I think the remoteness, the infrequency of this event, although it was planned for as an ultimate catastrophe, really is fatal to plaintiff's claim. As I said, And just to be clear, you think that the Arkansas kind of multi-factor analysis is the right framework, even on the assumption that, which I know you dispute, that Idacar is right? So we think this does not fall in the Idacar category. We see Idacar as applying the inevitably recurring flooding that the Supreme Court identified in Cress. And this is not an inevitably recurring flood. I mean, it could occur again at some remote point in time, but plaintiffs found no evidence at the liability stage of when that might occur, and the court made no findings as to that. So that's what I'd like to emphasize here. There's been no case that I've been able to uncover, either in my friend's papers or my own research, where the government has been responsible for compensation for a once in roughly a thousand year flooding event. How at all do your arguments differ based on the fact that these are upstream plaintiffs as opposed to downstream? So as I mentioned before, the downstream plaintiffs, and I'm trying to be mindful of the fact that that case is ongoing, causation is really determinative there. If the project had not been built, the downstream properties would have flooded to a much greater degree. And if the court had operated the project to leave the gates open, for example, even that would have flooded the downstream properties, all to a much greater degree. So in those cases, our view is that causation is determinative. Not so for the upstream plaintiffs, where we think it's really the remoteness of the occurrence of the storm. You're into your rebuttal time? Yes. I may reserve the rest. Okay. Thank you. Counselor Marzullo. Actually, I'm going to go first, Your Honor. Mr. Gershengorn. Good morning, Your Honors, and may it please the court. Ian Gershengorn for the Miku Plaintiffs. The government designed, intended, and engineered the dams here to hold all of the water from a storm the size of Harvey and much, much more. All along, the government could have purchased the private land within the dam's reservoir, but it chose not to, deciding that it would be cheaper to gamble, that such a storm would not occur, and that the reservoir would not be flooded. Then, when Harvey came, the dams worked exactly as they were intended, designed, and engineered to do, saving downtown Houston from being washed away, but flooding the private property behind the dams and in the reservoir. The Constitution permits the government to take private property in this manner for public use. It just requires the government to pay. So, Judge Toronto, if I could turn to your question. I guess the way we see it is the way, not saying that you thought this, but the way suggested by your question, which is that the government's emphasis on frequency really has no application here for a couple of reasons. Including, I'm sorry, including in the valuation. In the valuation, it does, correct. In the liability, it's not. We think that's exactly the way to think about it. So the thrust of the government's argument is that Harvey is this freak storm, and I want to make a couple of points on that. First, in every relevant respect here, it is not a freak storm. The dam was designed to handle, designed and engineered to handle a Harvey-sized storm, and much more. The elevation of the max pool from the dam, what they call the spillway design flood, was 115 feet above sea level. Harvey was 109 feet above sea level, and actually the government's purchase land was 103 feet above sea level. So this was, from a Harvey storm perspective, not unexpected. And indeed, the fact findings from Judge Leto make that clear. He found, quote, the Army Corps itself fully anticipated a storm the likes of Harvey. That's in Appendix 31. The reason for that, and the judge found, that this was highly likely to recur again. And so we think we meet the test. The reason that makes sense, Your Honor, is that as a couple of key factual points, which I want to make. Although Harvey itself was massive and unprecedented, part of the reason for that is that it was such a big storm, and parts of the area got like 60 inches. But over the relevant watershed, over the dams, the flood was no bigger than the Hearn storm, which was the design storm for these- Are you contending that the right framework is kind of the per se taking framework, or are you contending the right framework is the Arkansas case? So, Your Honor, we think that the per se framework is the right framework, though, per em, we win under the Arkansas game framework. But the reason why we think the per se framework is right is sort of twofold. One, we think that that's what this Court held in Idaho Farms, that this is what the Court said in Idaho Farms was, when it's foreseeably recurring flooding, it's a per se when the dams, quote, foreseeably produce intermittent invasions by flooding without identifiable end into the future. We think that's this case. We also think, related, that this actually is an easier case for the per se taking than Idaho Farms because it's upstream from the dam. I'm not aware of any case upstream from a dam where a court has applied the Arkansas game factors where the dam is still in existence. And in fact, this Court's decision in Stockton makes this point expressly. It says when you build a dam and the flooding is upstream from the dam, within the reservoir, within what the dam was engineered to do, even once is a taking as long as the dam is still there and the flooding could recur. And so we actually think this case is much easier. Now, that said, if the Court were to apply the Arkansas game factors, and I can run through them if you'd like, but we think, you know, when you look at the severity of the storm, right, it was three to five feet of water in some houses, fecal matter in the water, people displaced for months and years, so it was severe. The Court found below that the houses were in the residences, these are residential properties, were within the maximum flood plain. The Court found that the government could have purchased land but used a different storm for its decision to purchase land, a much smaller storm, than it did to design the dam. The Court found that at every relevant point, the government was aware or should have been aware, since initial construction of the dams and at every point forward, that the flood pools in Attica and Barker Reservoirs would at some point and thereafter exceed the government-owned land inundating plaintiff's properties. So you would argue this is a per se taking? I would, Your Honor. I think this is a per se taking. I think that follows from Idaker Farms. I think it follows from Cedar Point. This is the recurring flood behind the dam. My counsel said it's not inevitably recurring. I think, Your Honor, you said it right and I agree with the idea that this is inevitably recurring. We don't know whether it will be tomorrow, a year from now, or 40 years from now, or 100 years from now. Although what the Court found was it was highly likely to recur. And the reason he found that is because of the history of storms. And I can run through them all, but Your Honors are well aware. The Herms storm, the Taylor storm, 25 and 39, Claudette, Allison. Can I ask you something different? Does any part of your argument depend on saying that the choices the Court was facing and making during that four or five day period when it was deciding when to close the gates, when to open the gates, were unreasonable? No, Your Honor. We don't. In fact, that's the difference, we think, between a tort and a taking, that the government was authorized to do what it did and, in fact, should have done what it did. That's what Congress told it to do, was to build a dam to flood upstream properties and save downtown Houston. They just have to pay for it. And indeed, sort of to make that point, I think, even more clear, I'd like to just point to two quick things in the record, recognizing that I'm eating into my rebuttal time. But the, quote, operating concept of the dams, this is the CORE's own language, was, quote, imposing flooding on private lands without benefit of flowage easement or other legal right. And that's at A8836. The CORE found in the after action report that the dams, quote, functioned as intended. The project was performing as expected with no significant problems during this pool of record event. That's at A8762. So, Your Honor, nothing in our view depends on the idea that the CORE acted reasonably or unreasonably. But this was, the dam worked as it was supposed to. Right? From the CORE's perspective, this was a good thing. And from the country's perspective. Could you briefly respond to the argument that there was a necessity here to do what they did? Sure, Your Honor. And I, can I have, like, I'd like to make sort of two factual points and then a legal point. The two factual points are, one, sort of something I said, which was, there wasn't really an emergency in a sort of emergency, the way we use emergency. Congress from 1938, when it directed the CORE to build these things, said, what I want you to do is store water upstream on property. Right. So, I mean, one of the, this is directly related to this. So, you seem to use emergency as requiring a surprise. That's a surprising notion to me. So, no, Your Honor, I think, I think what I would say is that in the relevant, so, maybe this goes to the legal point. But let me, let me just say the, the lack of surprise. Like, the only surprise, the design, the dam was designed at congressional direction. But the dam was designed to hold this much and more. So, we don't think that that could be an emergency. What dams are supposed to do is hold water in very big storms to prevent downstream people from being flooded. That's not an emergency. That's their very point. Right. But if I could make a point on the legal side, too, on this sort of emergency, because I think it's important. The, the analogy the government draws is to, like, this fire, you know, sort of coming. And the, and the cases, the old cases that say that you can sort of burn a house in the, in the, in the path of the fire to stop the fire. But there is no case that says, if the fire is coming, you can take a house that's outside the path of the fire, burn, crash it down, take the bricks, and build a firewall without paying for it. No case says that. And, in fact, Trinko, from this court, or maybe a predecessor court, but Trinko, binding precedent here, says exactly that. That a, that a takings claim goes forward on a claim. In that case, it was a burning timber situation. And the plaintiff said, the fire was never going to reach my land, but the government burned my land. And what this court said is, that case gets to go forward. And so, I don't think the emergency doctrine has any applications here. The other cases, just for your honor's interest, I mean, Caltech's, the Supreme Court case, is exactly the same, right? There's the advancing Japanese army. The, the United States blows up a petroleum factory in the wake of the advancing army. The court says, no taking. The army was coming. But the court says, if you instead had seized that petroleum factory and operated it in the war, of course you'd have to pay for it. And it's the same distinction here. So, I don't think that emergency gets the government anywhere. I'm sorry, your honor, did you have, oh, sorry. I'm into my role. Okay. Thank you, your honors. May it please the court, Roger Marzulla, appearing on behalf of Christine and Todd Banker, whose property flooded to a depth of more than a foot and who spent several hundred thousand dollars repairing the structure and were excluded from their property for months and months as a result. And on behalf of Elizabeth Burnham, who was unable to repair her home and ended up ultimately selling it at a huge loss, as is. I'd like to address a couple of points. First, some fact points. Counsel says the plaintiffs did not introduce any evidence on the question of recurrence. I point the court to Appendix 52, in which the court describes the testimony of Dr. Bediant, that, a plaintiff's expert, that the recurrence is 35 to 50 years, and possibly 100, and to the testimony of a core employee, Mario, I believe it was Bottinger or something like that, who said that new information had become available and that, in fact, he thought that that indicated 10 to 35 years as the recurrence time. That evidence is in the record. Second — Recurrence of what? Recurrence of what? Recurrence of a storm similar to Harvey. To Harvey? But — Yes. That's the testimony. And the court — and this is sort of my next point — there's a phrase we didn't hear from the government, and that is clearly erroneous. The court did say that recurrence — Let me get something clear. Harvey was the largest storm recorded to date, when it came. Well, recorded at that time — It turned into 44 inches of rain that had dropped on this — on the Buffalo, Floyd, and Eastman. Yes. And the trial court also says that Esmeralda, two years later, was the same size as Harvey. So this largest — I also don't know — it was unclear to me in reading the opinion what largest actually meant. Does it mean how broad it was, how much rain it dropped in a particular place, how quickly it dropped the rain? In short, largest, I'm afraid, Your Honor, is a term that's a little bit ambiguous for us. That's up to you to define and argue. Well, what I'm saying is the term largest was used at one point, but not that it was different from, in terms of the water it produced, different from the prior storms. But do I understand, Your Honor, you just want to focus on the, I don't know, quite in a way, simple physical fact, enough water that when it builds up behind the dam, it will exceed the government-owned land and reach your land? Correct, Your Honor. And in fact, the Tax Day storm, 2016, the year before Harvey, also exceeded the government-owned land. That is, there's no question that the government intended to flood private property. They built a project intending to flood private property at some time, and perhaps they were lucky that that didn't happen. But I go back to that clearly erroneous, because the Court found that this was a recurring, that this was likely to recur. And the government has not presented to this Court any argument that suggests that even addresses the Court's actual findings. Rather, they're going back, the counsel said, well, it's a thousand-year flood. That's what their expert said, and that testimony was not accepted by the trial court. That's a clearly erroneous issue. It's not a matter for this Court, in the first instance, to be put to having to test that  The other topic I'd like to discuss is damages, which the Court raised. Counsel was pretty fast and loose with the term consequential. The definition of consequential, of course, is, or put another way, the line between direct and consequential damages in a taking case, is whether there is a direct relationship between the owner and the property. Well, the property interests here include not only the land, they include the houses that these people lived in. They include the personal property that people used, their furniture, their clothing, their appliances, and so forth. And they include the direct loss of use of the property, called displacement, awarded by the United States Supreme Court in cases like General Motors and Kimball Laundry, where the government physically moved in and the plaintiff had to move out and had to go somewhere else. I'm sorry, and so the damages there, you say, included, essentially, costs incurred when they went somewhere else? Yes, that's right, Your Honor. General Motors was a parts warehouse, and they had to pick up and move all their parts out of the warehouse for the government. That was held to be a And that's what the Fifth Amendment, of course, is all about, compensating for the property that has been taken by the government. Can I ask you a damages-related question? And I'm not entirely sure whether it's in your bailiwick. I know you don't have a cross appeal. So I want to understand the following. So there's been compensation for the flowage easement, discounted, presumably, by the likelihood of that. There's also been compensation for harmed physical, the personal property and other things that has already occurred, on the assumption that this will, in fact, happen again. When the house or the personal property is damaged again, is there more compensation at that point? Probably not, Your Honor. Although, if I get that case, I might make a different argument. Right. I think there's a footnote in the gray brief, the reply on the cross appeal that says you don't have to decide that here. But I'm curious how that, you know, I think I think once your property is subject to a flooding easement, you're not going to have a claim for losses resulting from the exercise of that flooding easement. So that's why it is a one-time, one-shot thing. The government has here acquired the right, by way of the physical invasion of the plaintiff's fee ownership, their right to exclude, their right of use, their ownership of these various interests, the land, the structures, the personal property, the automobiles, the landscaping, and so forth. And once the government acquires that, and it's a recorded easement in this case, there won't be additional compensation, I think. I would also just like to make a comment about the so-called emergency. The court again dealt with that and said, and I think the court sort of explored that issue, that this is an emergency created by the government, a circumstance created by the government, that they built the dams, they impounded the water, and as the court sort of put it, they built a project that was meant to contain more water than the acquired land could hold. That was the plan. It operated exactly as they intended it to. They set forth in their 2012 manual, this is how we're going to do it. We're going to flood these people's land when we have that much water backed up behind the dam. I think we have that part of the government argument, and you're out of time. Thank you, Your Honor. Yes. Are we going to hear now? You're going to address? All right. Go ahead. Yes, I think I am. Cross-appeal? Completed. Thank you, Your Honor. Starting first with my friend for the Amici Plaintiffs and Cross-Appellants, made the point that because the storm occurred upstream, this was much easier. Their argument for that relies on a case called Stockton from the Court of Claims, this court's predecessor. Our point about Stockton, which you make in the brief, is that the government there conceded that there was a return frequency of the flooding once every, I believe it was eight or nine years. The flooding was not just once. It was once, and then it was approximated a couple more times within a year or so. That was within eight or nine years of when the dam was initially built. It's far more frequent than even under my friend's best estimates as to when a similar flood would recur here. As to the severity issue, the court has described that in terms of frequency, as I mentioned with the Ridgeline excerpt. It's not a case where you look at the severity of damage to the property to determine whether it's a taking or a tort. Obviously, Hurricane Harvey was a catastrophe and devastated the victims who lost their homes and, in many cases, lives. But to determine whether the compensation for the property invasion is a tort or taking, you look to the character of the invasion. So that entails an inquiry into frequency. Can I just ask a kind of background question? If this had been a trespass, am I right in thinking the government would not be liable either under the Federal Tort Claims Act or under the no liability provision of the 1928 or something Flood Control Act? We would certainly make those arguments that we're immune. And that's Congress's decision. I mean, we view that as Congress's prerogative whether to adjust that compensation to allow for, you know, if it wanted to adjust the government's sovereign immunity to tort, it would be Congress's prerogative to do so. And that kind of leads into the Flood Control Act question, which... Do you have a case that supports the statement on damages you just made? Well, the Robinson case, which was the companion to the Katrina litigation that was at issue in St. Bernard Parish, it was a Fifth Circuit case that's probably cited in the St. Bernard Parish case where we prevailed, the government prevailed on the discretionary function exception for Federal Tort Claims Act and also made the Flood Control Act immunity argument. So, that ties into the questions about necessity doctrine in the emergency, which we think are background principles here that can be and ought to be used to construe plaintiff's reasonable expectations. We agree that, Judge Torano, with the implication of your question that an emergency does not need to be a surprise. Sound engineering plans for remote but potentially catastrophic events like dam failure and makes adjustments in order for Congress to have authorized the Corps of Engineers to embark upon the Nationwide Flood Control Program that it did through the Flood Control Act that included this project. It understood... In fact, the legislative history cites a case from the Supreme Court called Bedford that said that consequential damages were not compensable as a taking and then it went on with that understanding that there wouldn't be that sort of consequential liability in taking to immunize the government from liability from flooding as well. So, it was with that view in mind that Congress embarked upon this effort that's resulted in this project and among many more across the Nation. I know I'm out of time. Just if I could respond briefly to a point from my friend from the Bankers Burnham plaintiff's appellees. He mentions the evidence in the record about frequency that he pointed to in a footnote from the liability opinion. I think regardless of what evidence was presented, it was incumbent upon the trial judge to make a finding and he did not do so. He didn't do so at the liability stage. He didn't do so at the valuation stage either. He rejected both parties' evidence at the valuation stage expressly and that was error. On the losses and damages question, we stand by our argument that the way to compensate for the acquisition of a property interest that's an easement is to look at the value of the underlying fee before and after the date of taking. That was what the court should have relied upon here instead of compensating for a miscellany of other losses that were more tort-like in their nature. So, we would ask the court's judgment be reversed. We've got two minutes. Thank you, Your Honor, and I'm limiting myself to the cross-appeal issues. So, I want to make a couple of quick points. First, for Ms. Popovich, this was the one where the court found a taking, the easement is recorded on her land and the court awarded zero damages even though both experts, even the government's expert, conceded that the damages were in the thousands. I urge the court to look at page 811A11425 for a picture of Ms. Popovich's land. The water covers 56% of her property. Zero just can't be the right answer and it's important because there are hundreds or even thousands of people on that contour line. And so, the idea that none of those people get compensation just because the water flooded their property but touched their structure seems like indefensible. Second, class action. So, this case should not be another wind star, right? This is a case that on the liability side. Would I be surmising correctly that the difference between a class action here, if you were to get it, and a class action in the next case is the resolution of all these factual issues would be binding, whereas in the next case, there's no non-mutual collateral estoppel against the government? Correct, Your Honor. And so, the problem is, like, this sort of goes to, I think, the main point here, which is the government, we think the class motion was timely, but regardless, there was no prejudice to the experts, pool-wide testimony, right? It's only a liability class. We're not talking about individual damages. And so, the idea that the right answer here is to go back and do this again, potentially, for 150,000 plaintiffs. Like, to bring in the same experts to testify that, you know, Harvey dropped only 31 inches of water on this watershed, even though it was 44 inches wide. One more question about that. Your brief seems to be arguing that you were something like compelled to delay the filing. Is that an essential part of your argument, as opposed to justified by what sure sounded like permissions? I think it's really the latter, Your Honor. So, our view is, the court, both Chief Judge Braden and Judge Leto basically said, do class cert after jurisdiction. In theory, we could say, notwithstanding, Your Honor, notwithstanding the fact that you're going to try our case, we're ignoring you and putting in a motion you told us not to do, it puts lawyers in a very difficult position. But our main point is, regardless of that, given that permission, there's no categorical bar on certifying a liability class after the merits and no prejudice to the government. It was asked at every stage in our briefs. The problem with that is that you're asking us to have the claims court direct the litigation on behalf of the parties. I mean, the timing for a motion to certify a class is essential and very foundational. And you just, you didn't do it. I mean, you're claiming that, well, the court told us not to or they had us wait, but it should have been your responsibility to have followed the motion. Yes, I understand that, Your Honor. A couple of quick points. I get Your Honor's point. So all I would say is, they told us to do it after jurisdiction, we did it after jurisdiction. Our second point is, regardless, there's no prejudice to the government here at all. And third, and maybe at the end of the day, this isn't a footnote. There's something wrong in certifying a class after liability has been. So I think that's right, Your Honor, and we get that the courts are hesitant to do that, but we don't think there's a categorical bar. And in a situation where there's no prejudice to the government and obvious synergies for the Court of Federal Claims, we think that's important. But if I could just make one more point on this and then move on quickly to FEMA and then I'll stop. We say this in a footnote. What's very important is, even if you don't agree with us, that you either, that nothing in the opinion or that you make clear, that subsequent plaintiffs can bring, can move to certify a class. So in other words, even if these plaintiffs don't, that a subsequent plaintiff could move to certify a class and have this proceed in a sensible manner. So we think that it should be reversed, but if not, it's certainly not foreclosed for the other 140,000, 50,000 plaintiffs. Last point on FEMA, very quickly, the Hendler Special Benefits Test is not met by FEMA. Judge Leno was bothered by the prospect of double recovery, so I want to make one clear point. There is nothing in the record that suggests a double recovery by any of the plaintiffs here. And the reason for that is the government chose to introduce the FEMA offsets as a category, not individualized. So there is no record of a single person getting double recovery from FEMA and from their requests for personal property. And the reason for that is the government chose that. So we think the law doesn't, the FEMA offsets don't count under Hendler as a special benefit. But even if this Court were to extend Hendler, there is no reason to do so here when the record shows no double recovery. If the Court has no questions. Thank you. We thank the party for their arguments.